UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| BEHRING REGIONAL CENTER LLC,<br><br>    Plaintiff,<br><br>    v.<br><br>ALEJANDRO MAYORKAS, et al.,<br><br>    Defendants. | Case No. 22-cv-02487-VC<br><br>**ORDER GRANTING PLAINTIFF'S MOTION FOR A PRELIMINARY INJUNCTION**<br><br>Re: Dkt. No. 8 |

      In March 2022, Congress enacted the Reform and Integrity Act, which reauthorized and revamped the system governing so-called regional centers—entities that pool investments from foreign visa applicants to promote job growth in the United States. The United States Citizenship and Immigration Services (USCIS) interpreted the Act as unequivocally deauthorizing the 600-plus previously authorized regional centers. The agency thus announced that the existing regional centers were deauthorized, effectively cutting off their revenue streams. That was almost certainly legal error, because it is unclear whether the Integrity Act deauthorized existing regional centers or allowed them to continue operating under Congress's new regime. The agency was therefore required to weigh competing interests before deciding whether the existing regional centers should be deauthorized. And the agency's treatment of the previously authorized regional centers is harming them irreparably, in a manner that is contrary to the public interest. Therefore, the agency is enjoined from treating the existing regional centers as deauthorized while this litigation is pending (or until the agency engages in a reasoned decision-making process regarding how to treat these centers under the Integrity Act).

I

A

The EB-5 visa program provides a path to permanent residency for immigrants who invest a certain amount of money in commercial enterprises within the United States. 8 U.S.C. § 1153(b)(5). Originally, to qualify for the program, visa applicants were required to demonstrate that their investments led directly to the creation of a specified number of jobs in this country. In 1992, Congress established a "pilot program" designed to give applicants more flexibility in how they could invest. *See* Departments of Commerce, Justice, and State, the Judiciary, and Related Agencies Appropriations Act of 1993, Pub. L. 102-395, § 610(a), 106 Stat. 1828, 1874 (1992). The pilot program created a role for "regional centers" in the investment process. Specifically, the legislation allowed applicants to invest in regional centers, and allowed those centers to pool investments and deploy capital for job creation. Under this system, although the EB-5 visa applicant creates jobs only indirectly, the government still credits the applicant for their investment. *See U.S. Securities & Exchange Commission v. Feng*, 935 F.3d 721, 726 (9th Cir. 2019).

Typically, when Congress creates a new program, it does so in an "authorization bill." But it created the regional center pilot program in an annual spending bill—that is, an "appropriations bill." Section 610(a) of the 1992 Appropriations Act provided that the Secretary of State "shall set aside visas for a pilot program" that "shall involve a regional center in the United States for the promotion of economic growth." 106 Stat. at 1874. Section 610(b) of the bill then specified the number of visas that must be set aside. *Id.* Section 610(b) also included a sunset date of October 1, 1997, five years after the bill's enactment.

As discussed more fully in Section II, there has apparently been confusion about whether the sunset date applies only to the specific subsection in which it appears—that is, section 610(b)—or to the entire program created by the appropriations bill. For now, suffice to say that Congress has frequently "reauthorized" the program over the past thirty years by changing the sunset date. Sometimes the reauthorization has occurred after the sunset date already passed, but Congress has consistently continued the program. *See Hulli v. Mayorkas*, 549 F.Supp.3d 95, 98

(D.D.C. 2021). The regional center program thus became a "pilot" in name only, and more than 600 regional centers operated throughout the country as of 2021.

Recently, things changed. Over the years, concerns grew that the regional center program was susceptible to fraud and abuse. *See Mirror Lake Village, LLC v. Wolf*, 971 F.3d 373, 378 (D.C. Cir. 2020) (Henderson, J., concurring). The agency charged with overseeing the program, USCIS, faced difficulty confirming that immigrant investors were using funds from lawful sources. Worries mounted that regional centers might be taking advantage of foreign investors. And the program suffered from the "appearance of favoritism and special access." Holly Straut-Eppsteiner, Congressional Research Service, R44475, *EB-5 Immigrant Investor Visa* 20 (2021). Thus, when the appropriations language lapsed most recently—in June 2021—Members of Congress set out to reform the program. Their efforts culminated in the Reform and Integrity Act of 2022, which reauthorized the regional center program but reformed it substantially, adding dozens of pages of new statutory text and incorporating a series of reforms designed to strengthen oversight and combat fraud. EB-5 Reform and Integrity Act of 2022, 8 U.S.C. § 1153. The Integrity Act also moved the pertinent statutory language to new location—specifically, Title 8, Section 1153 of the United States Code (which is titled "Allocation of immigrant visas"). This new language remains in effect until September 2027, at which point reauthorization would be required once again. Reform and Integrity Act § 103(b)(1).[1]

The Integrity Act took effect on March 15, 2022. Thus, for a roughly 9-month period—from the time the old language from the 1992 appropriations bill lapsed in June 2021 until the effective date of the new legislation—the 600-plus existing regional centers operated in a grey zone. The agency continued to treat those centers as authorized pursuant to the pilot program's statutory authority and continued to process applications submitted by immigrants who had invested through those centers prior to the sunset date. But the agency refused to process new petitions submitted by immigrants investing through regional centers, viewing the sunset date as

---

[1] This ruling subsequently refers to the Integrity Act's section numbers, rather than the relevant provisions of the United States Code.

a "pencils down" directive from Congress. Dkt. No. 58 at 26, 59. Apparently, this is how the agency treated the regional centers in prior periods where the program expired without a reauthorization enacted by Congress. *Id.* at 23.

Following the Integrity Act's enactment, USCIS posted a notice on its website announcing a "New EB-5 Regional Center Program." *See EB-5 Immigrant Investor Program*, U.S. Citizenship and Immigration Services, https://www.uscis.gov/working-in-the-united-states/permanent-workers/eb-5-immigrant-investor-program. The agency asserted that Congress "repealed" the original program by passing the Integrity Act. *Id.* It then stated: "Therefore, regional centers previously designated under section 610"—that is, the section of the 1992 appropriations bill that first created the regional center program—"are no longer authorized." *Id.* The agency has since created a revamped process by which prospective regional centers can attain authorization.

B

Behring Regional Center operates in California under the original program that Congress authorized in 1992. Like hundreds of regional centers across the country, it pools investments to fund domestic projects. Following the agency's announcement that regional centers "previously designated . . . are no longer authorized," Behring sued. It contends that the agency wrongly interpreted the Integrity Act as deauthorizing existing regional centers and that the agency's announcement was arbitrary and capricious within the meaning of the Administrative Procedure Act (APA). 5 U.S.C. § 706.

Behring moved for a temporary restraining order, asking that USCIS be enjoined from treating it and the other regional centers as deauthorized, the consequence being that USCIS would resume processing new visa petitions from immigrant investors who were investing through regional centers. (These petitions are called "I-526 petitions.") After the agency appeared, the parties agreed that Behring's TRO application be treated as a motion for a preliminary injunction. A trade association called Invest in the USA, which represents regional centers across the country, has also appeared as an amicus for Behring.

Since the agency announced its revamped process for attaining status as a regional center, Behring (along with dozens of other previously authorized regional centers) applied by filing what the agency calls an "I-956 petition." USCIS interprets the Integrity Act as setting a nonbinding target date of six months by which the agency should process any new I-956 application. *See* Reform and Integrity Act § 106(b); Dkt. No. 39 at 27–28. The agency has not yet ruled on Behring's application, nor, as far as the Court is aware, anyone else's.

## II

To secure a preliminary injunction, a plaintiff must show that "he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest." *Winter v. Natural Resources Defense Council, Inc.*, 555 U.S. 7, 20 (2008).

1. *Likelihood of Success on the Merits*. The APA instructs courts to "hold unlawful and set aside agency action . . . found to be . . . arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A). Agency decisions "cannot be sustained" where they are "based not on the agency's own judgment but on an erroneous view of the law." *Prill v. National Labor Relations Board*, 755 F.2d 941, 947 (D.C. Cir. 1985); *see also National Labor Relations Board v. Brown*, 380 U.S. 278, 292 (1965) ("Courts must, of course, set aside Board decisions which rest on an 'erroneous legal foundation.'" (citation omitted)); *Safe Air For Everyone v. U.S. E.P.A.*, 488 F.3d 1088, 1101 (9th Cir. 2007) (vacating an agency rule based on a "legally erroneous" premise); *California by and Through Becerra v. Azar*, 501 F.Supp.3d 830, 837–38 (N.D. Cal. 2020) (explaining that agency decisions based on erroneous legal conclusions must be "vacated").

Behring has made an exceedingly strong showing that the agency violated the APA. USCIS was almost certainly wrong in assuming that the Integrity Act affirmatively deauthorized existing regional centers, so the agency was almost certainly wrong to announce that the centers are no longer authorized. In reality, the Act is silent or ambiguous on the question, with some portions of the Act suggesting that Congress did not intend to deauthorize the existing centers.

5

The Act enshrines a series of requirements that regional centers must meet to become authorized, requiring for instance that "[t]he proposal to establish a regional center shall demonstrate that the pooled investment will have a substantive economic impact" on a defined "geographic area." *See* Reform and Integrity Act § 103(b)(1)(E)(iii). The Act also requires that proposals include "reasonable predictions . . . concerning the amount of investment that will be pooled" and the "kinds of commercial enterprises that will receive such investments." *Id.* § 103(b)(1)(E)(iii)(I). Prospective regional centers must also offer "a description of the policies and procedures in place" to "ensure compliance" with various securities laws. *Id.* § 103(b)(1)(E)(iii)(II). These requirements apply to a "proposal to establish a regional center," which leaves open the question whether they apply to regional centers that were already in existence and operating when the Integrity Act became law. *Id.* § 103(b)(1)(E)(iii). Of course, this is not to say that the agency is precluded from taking action to ensure that existing regional centers comply with the new requirements of the Integrity Act (more on that below). But the provisions relating to a "proposal to establish a regional center" seem to cut against the notion that the Act compels the centers to start all over again as if they never existed.

Other provisions in the Integrity Act hint that Congress may not have intended to strip previously designated regional centers of their authorization. For instance, the Act requires that regional centers "file an application with the Secretary of Homeland Security for each particular investment offering through an associated new commercial enterprise before any alien files a petition for classification under this paragraph by reason of investment in that offering." *Id.* § 103(b)(1)(F)(i). To secure approval of those investment offerings, regional centers must provide a "comprehensive business plan," a "credible economic analysis regarding estimated job creation," various documents relating to the investment, and a "description of the policies and procedures" designed to ensure compliance with the securities laws, among other things. *See id.* And the Act provides that the agency's approval of a business plan "shall be binding for purposes of the adjudication of subsequent petitions seeking classification under this paragraph by immigrants investing in the same offering described in such application," even if the

6

application's approval occurred *before* the Integrity Act became law. *Id.* § 103(b)(1)(F)(ii). That the Integrity Act provides for the continuing validity of business plans approved prior to the Act's passage offers some evidence that Congress did not intend to deauthorize the very centers that spawned those plans.

Further, as previously mentioned, the Act gives the Secretary multiple tools to ensure ongoing compliance with its provisions, suggesting that Congress may have considered that existing regional centers would retain their status. The Act provides a process by which regional centers must "submit an annual statement" including various information about the center's operations and investments. *See* § 103(b)(1)(G)(i). The Secretary of Homeland Security may impose sanctions if a regional center "fails to submit an annual statement," including "termination of regional center designation." *Id.* § 103(b)(1)(G)(iii)(I)–(II). The Act provides that the Secretary has discretion to "suspend or terminate the designation of any regional center" if the center makes certain kinds of misrepresentations, among other things. *Id.* § 103(b)(1)(H)(iv)(I). These compliance mechanisms could be understood as paving a path for existing regional centers to certify that they are meeting the new requirements articulated in the Act.

The title of section 103, "Reauthorization and Reform of the Regional Center Program," provides more evidence that the Act does not automatically deauthorize existing regional centers (or command the agency to do so). True, the "title of a statute . . . cannot limit the plain meaning of the text" and "is of use only when it sheds light on some ambiguous word or phrase." *Pennsylvania Department of Corrections v. Yeskey*, 524 U.S. 206, 212 (1998) (quotations and citation omitted). The Integrity Act, however, is far from clear when it comes to whether existing regional centers may remain authorized. In that context, section 103's use of the word "reauthorization" provides at least some weight to the view that Congress did not mean to strip existing centers of their authorization.

Against all this, the agency relies almost exclusively on the fact that the Integrity Act "repealed" the old appropriations language that established the original 1992 pilot program and

7

replaced it with new language in 8 U.S.C. § 1153(b)(5).[2] The government's view is that by eliminating the original language, Congress meant to deauthorize any regional centers that the agency had designated pursuant to that language. How can a designation persist where its font of authority no longer exists, the government asks?

This places too much weight on Congress's use of the word "repeal." Recall that one of the persistent problems with the former regional center program was that the program—or at least section 610(b), which set aside a specific number of visas—kept expiring. 106 Stat. at 1874. As part of the "reauthorization and reform" of the program, Congress decided to place the relevant statutory language in 8 U.S.C. § 1153, rather than keeping it in an appropriations bill from 1992. So, although it's possible that use of the word "repeal" reflected an intent to deauthorize the regional centers, perhaps Congress was simply removing language from one place in the tapestry of statutory law (appropriations language appended as a "note" to Title 8, Section 1153) and inserting the new language into a more stable part of that tapestry (the actual text of Title 8, Section 1153). After all, if Congress had intended to take the seemingly dramatic step of cutting off revenue for hundreds of longstanding regional centers, it could have done so far more transparently. It could have said something like: "All regional centers are deauthorized and must petition the agency for new approval pursuant to the terms of this statute."

Speaking of which, the agency points to a statement made by Senator Charles Grassley to bolster its view that Congress deauthorized existing regional centers. Senator Grassley asserted that "[a]ll regional centers which operated under the lapsed and repealed pilot program will be expected to seek a new regional center designation in compliance with the new requirements and reforms laid out in our bill." 168 Cong. Rec. S1105 (daily ed. Mar. 10, 2022). Although the government initially asserted that Senator Grassley made this statement on the Senate floor before passage of the legislation, that does not appear to be correct. The Congressional Record is disappointingly unclear on the question, but when the Court asked the agency about it at oral

---

[2] Before passage of the Integrity Act, section 610 of the 1992 appropriations bill existed as a "note" to 8 U.S.C. § 1153.

8

argument, the agency conceded that Senator Grassley appears not to have delivered the remarks on the floor, which likely means his written remarks were inserted into the record at some point. Dkt. No. 58 at 41. Regardless, Senator Grassley's remarks carry little if any interpretive weight. Indeed, the agency's heavy reliance on this questionable sliver of legislative history only underscores that the statute itself is ambiguous or silent on the question.

Finally, the government made a concession during adjudication of this preliminary injunction motion that is relevant to the question whether the Integrity Act must be interpreted as "deauthorizing" existing regional centers. As discussed previously, from June 30, 2021 (the most recent sunset date) to March 15, 2022 (the Integrity Act's enactment date) the regional centers operated in a grey zone. During this period, as with prior grey zones, USCIS apparently continued to regulate the regional centers and required them to pay fees. The agency asserts that it was authorized to continue regulating the centers during these periods because section 610(a) of the 1992 appropriations bill remained in effect. To recall, section 610(a) simply provided that the Secretary of State "shall set aside visas for a pilot program" that "shall involve a regional center in the United States for the promotion of economic growth." 106 Stat. at 1874. Section 610(b) then specified the number of visas that must be set aside and also included the sunset date. The agency's position is that although section 610(b) was no longer operative following the sunset date, section 610(a) remained operative. In the agency's view, existing regional centers therefore retained their authorized status following the sunset date, even though the agency refused to process new visa applications from immigrants investing through regional centers until section 610(b) became operative again. Dkt. No. 58 at 14–18. Behring, for its part, agrees that Section 610(a) remained operative following the sunset date (even while complaining that the agency has expressed differing views in prior litigation). *Id.* at 46–47.

With both parties agreeing that the regional centers remained authorized during the sunset period, the Court has little choice but to accept that interpretation for purposes of this preliminary injunction motion. But that view undercuts the agency's argument about the effect of the Integrity Act on the status of existing regional centers. It would be one thing if the regional

centers had become "deauthorized" after the June 30, 2021 sunset date. Were that the case, Behring would be forced to argue that the Integrity Act "reauthorized" them—perhaps an uphill battle given the absence of language stating that previously authorized regional centers would be brought back to life. But because all agree that the centers remained authorized and subject to federal regulation during the interval period, the agency is stuck arguing that the Act unequivocally "deauthorized" them. That is even more of an uphill battle, given the absence of any language in the Act stating that the existing regional centers were being shut down, and given the various hints in the Act that Congress might have intended for them to keep operating.[3]

In short, the Integrity Act does not clearly answer the question whether Congress meant to strip existing regional centers of their authorization. But the agency provided no other explanation for its decision. It stated only that because Congress "repealed Section 610, . . . regional centers previously designated under section 610 are no longer authorized." The agency's conclusion therefore rests on a misreading of the law: USCIS thought itself compelled by the Integrity Act to treat the existing regional centers as deauthorized, even though the Act does not require that outcome. Had the agency considered the question, balanced the competing interests at stake, and arrived at a decision on the continued status of existing regional centers, perhaps the agency could successfully defend its action. But because USCIS rested its action solely on "an erroneous view of the law," Behring is exceedingly likely (if not certain) to prevail on the merits of its claim that the agency's decision is arbitrary and capricious under the Administrative Procedure Act. *Prill*, 755 F.2d at 947.

2. *Irreparable Harm*. Behring makes a compelling case that it faces ever-increasing irreparable harm from the agency's decision to deauthorize existing regional centers. The firm

---

[3] Although it doesn't matter for purposes of this motion, the agency's treatment of the regional centers during the grey zone period seems strange in light of its current interpretation of section 610. If the agency is correct that section 610(a) remained operative while section 610(b) did not, this would mean that the Secretary of State remained under an obligation to "set aside visas for a pilot program" that "shall involve a regional center." If this statutory obligation remained (with only section 610(b)'s designation of a specific number of visas becoming inoperative), it's not clear how UCSIS could legitimately have refused to process new visa applications that came through the regional centers.

relies on funding from immigrants hoping to attain EB-5 visas. Faced with the agency's decision to strip it of its status, Behring maintains that it cannot raise capital or make financing commitments for new projects. It credibly alleges that its existence is threatened by the agency's decision to announce that previously existing regional centers are deauthorized. *See American Passage Media Corp. v. Cass Communications, Inc.*, 750 F.2d 1470, 1474 (9th Cir. 1985) ("The threat of being driven out of business is sufficient to establish irreparable harm."). And even aside from the threat to Behring's business, this is one of those unusual cases where financial harm alone constitutes irreparable harm because Behring will be unable to recoup its financial losses from the government. *See Federal Deposit Insurance Corporation v. Meyer*, 510 U.S. 471, 475 (1994) ("Absent a waiver, sovereign immunity shields the Federal Government and its agencies from suit."); *see also Feinerman v. Bernardi*, 558 F.Supp.2d 36, 51 (D.D.C. 2008) ("[W]here, as here, the plaintiff in question cannot recover damages from the defendant due to the defendant's sovereign immunity, any loss of income suffered by a plaintiff is irreparable *per se*." (citations omitted)).

      3. *Balance of Hardships/Public Interest*. The last two *Winter* factors, which look to the harm to the government and the public interest, "merge when the Government is the opposing party." *Nken v. Holder*, 556 U.S. 418, 435 (2009). Multiple interests come into play in a case like this. The public maintains a valid interest in seeing that the laws passed by its representatives are faithfully applied by the Executive Branch and, by the same token, that administrative agencies do not run afoul of the APA. *See California v. Azar*, 911 F.3d 558, 581 (9th Cir. 2018). Also relevant is the "government's interest in efficient administration of the immigration laws at the border." *Landon v. Plasencia*, 459 U.S. 21, 34 (1982).

      The public interest in ensuring that administrative agencies conform with the requirements of the APA tilts in favor of granting preliminary relief. As explained above, the agency acted based on an erroneous conclusion about what the Integrity Act requires. That the Act pertains to immigration does not overcome the public interest in vindicating the APA's requirements, especially in this context, where the "efficient administration of the immigration

11

laws" does not cut clearly in one direction.

Given Behring's likelihood of success, the danger of irreparable harm, and the public interest in seeing federal agencies follow the APA, Behring has met the bar for a preliminary injunction.

III

That leaves a question about the appropriate remedy. Where an agency acts pursuant to an erroneous legal conclusion, "the normal remedy is to set aside that action and remand the case to the agency." *Azar*, 501 F.Supp.3d at 842. The agency can then consider the "competing interests at stake" to resolve the ambiguity in the statute. *Id.* But here, Behring has filed a motion for a preliminary injunction, not a motion for summary judgment. So the question is what sort of relief to order at this preliminary stage in the litigation.

It would make no sense to afford relief to just Behring, while allowing the agency to continue to treat more than 600 other existing regional centers as deauthorized. Although district courts retain equitable discretion to fashion injunctive remedies narrowly, it would be unfair to cabin the relief to Behring alone. If the agency were enjoined from deauthorizing only Behring, the firm would receive a windfall: It would be the only designated regional center in the United States. Foreign investors eager to apply for EB-5 visas would likely flood Behring with capital, leaving the other 600-plus regional centers throughout the United States on the bench. But many of those regional centers are not sitting idly by. Invest in the USA, an amicus in this case, has moved to intervene on behalf of over 100 regional centers throughout the country.

In any event, such limited relief would be difficult to square with Section 706 of the APA, which authorizes courts to "set aside" unlawful agency actions. 5 U.S.C. § 706(2). Where a reviewing court determines that agency actions violate the law, "the ordinary result" is that the action is "vacated," and not that the "application to the individual petitioners is proscribed." *East Bay Sanctuary Covenant v. Biden*, 993 F.3d 640, 681 (9th Cir. 2021) (quotations and citation omitted). Because Behring's claim, if successful, would likely culminate in vacating the agency's action as to all regional centers—not just Behring—it makes little sense to grant

preliminary relief in a manner out of step with that eventual remedy. And where a party moves for a preliminary injunction in a case arising under the APA, district courts retain the authority to enjoin the agency's action while litigation progresses. *See Azar*, 911 F.3d at 585.

Accordingly, USCIS is preliminarily enjoined from treating as deauthorized the previously designated regional centers based on its almost certainly erroneous interpretation of the Integrity Act. Of course, the agency may do whatever is reasonably necessary to ensure that the existing regional centers comply with the Integrity Act, but those centers must presently be permitted to operate within the regime created by the Act. This includes processing new I-526 petitions from immigrants investing through previously authorized regional centers like Behring, just as the agency would do for a newly approved regional center.

The preliminary injunction will remain in place until the earlier of: (1) a ruling on summary judgment by this Court; or (2) a reasoned decision by the agency about how regional centers should be treated given the Integrity Act's ambiguity. Perhaps, after engaging in a reasoned decision-making process and considering the competing policy factors, the agency could conclude that Behring and the other previously authorized regional centers can no longer operate until they have successfully reapplied by submitting new I-956 petitions. Perhaps the agency could conclude that the centers must reapply but can operate consistent with the requirements of the Integrity Act pending their new applications. Or perhaps the agency could conclude that the centers can operate without reapplying so long as they otherwise comply with the Act's requirements. But what's clear is that the agency cannot deem the existing regional centers deauthorized without engaging in reasoned decision-making consistent with the APA.

IV

Because this case is so complicated, it's worth concluding with an analogy. Essentially, Behring and its regional center peers attained status as members of a club created by Congress. Congress tasked the agency with admitting members, crafting club rules, and doling out club privileges. Although the club became inactive from time to time, Congress repeatedly opened its doors again, and the agency did not force existing members to reapply—the members retained

their status throughout. This time, with the Integrity Act, Congress made many changes to the club's structure. It crafted new admission requirements and altered club privileges. But it did not specify whether existing members could—as they had before—remain members. Then the agency kicked out all the existing members, assuming that Congress forced its hand. The agency was wrong to act based on that assumption. That does not mean the agency may not now consider the competing interests at stake and decide to require all existing members to seek new admission to the club. But it does mean that, for now, the agency must continue treating the existing members as members of the newly revamped club. The motion for a preliminary injunction is granted.

The Court will address case scheduling at the hearing on Invest in the USA's motion to intervene on July 14, 2022. The parties should prepare a joint case management statement in advance of that hearing, to be filed no later than July 7, 2022.

**IT IS SO ORDERED.**

Dated: June 24, 2022

_____
VINCE CHHABRIA
United States District Judge